IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| EAST HALLOWS LIMITED LIABILITY COMPANY, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>LIVE NATION ENTERTAINMENT, INC., )<br>)<br>Defendant. ) | )<br>)<br>)<br>)<br>NO. 3:19-cv-00465<br>)<br>)  JUDGE CAMPBELL<br>)  MAGISTRATE JUDGE FRENSLEY<br>)<br>)<br>) |

## MEMORANDUM

Rae Solomon had an idea for an all-female music festival she called Zenitheve. Together with Jacob Green, she formed East Hallows, LLC , to bring the idea to fruition. In the summer of 2018 she discussed Zenitheve with senior executives from Live Nation Entertainment, Inc. ("Live Nation"), providing them with her plans, including the potential artist lineup, financial projections, and proposed locations. She hoped Live Nation would invest in Zenitheve. After months of discussions, in which Solomon claims Live Nation "strung her along," Live Nation told Solomon that it had decided not to provide funding for Zenitheve. One month later, Live Nation announced that the first day of its Lake Shake 2019 festival would include an all-female lineup consisting of five of the artists Solomon proposed for Zenitheve. Solomon claims Live Nation intentionally and negligently misrepresented its intent to invest in Zenitheve.

Now before the Court is Live Nation's Motion for Summary Judgment, which is fully briefed. (Doc. No. 43). Plaintiff East Hallows Limited Liability Company ("East Hallows") filed a Response (Doc. No. 47) and supporting evidence, including the Declaration of Rae Solomon (Doc. No. 49-1) and two expert reports (Doc. No. 48-3, 48-4). Live Nation filed a Reply (Doc. No.

53) and moved to strike portions of the Solomon Declaration and both expert reports. (Doc. No. 51). The Motion to Strike is also fully briefed. (Doc. Nos. 56, 67, 69).

## I. MOTION TO STRIKE

Live Nation moves, pursuant to Federal Rule of Civil Procedure 56, to strike the declaration of Rae Solomon ("Solomon Declaration") (Doc. No. 49-1) and Exhibit 41 to Solomon's Deposition ("Exhibit 41") (Doc. No. 49-5 at PageID # 792-95). Live Nation also requests that the Court strike and disregard the expert reports of Mr. Alan Kates (Doc. No. 48-4) and Mr. Edward Cheng (Doc. No. 48-3).

### A. The Expert Reports

Plaintiff moved to withdraw the expert report of Mr. Kates. (Doc. No. 62). With regard to the expert report of Mr. Cheng, the Court does not reach any issues for which Mr. Cheng's opinions are relevant evidence on summary judgment. Accordingly, the motion to strike the expert reports is moot.

### B. Solomon Declaration

Live Nation moves to strike the Solomon Declaration on the grounds that it contains hearsay, speculation, and contradicts what she previously testified to in her deposition. (Doc. No. 51 at 2).[1] For the reasons discussed below, Live Nation's motion to strike will be denied as to Solomon's declaration.

---

[1] Live Nation also moved to strike paragraphs 13, 14, 21, and 29 from the Solomon Declaration on the grounds that they contain "objectively false assertions." Live Nation does not direct the Court to authority supporting this request. As such, the Court declines to address this argument in ruling on Live Nation's pending motion to strike.

2

1. Hearsay Statements

Live Nation summarily asserts that the Court should strike paragraphs one, ten, sixteen, twenty-four, and twenty-six from Solomon's declaration because they are hearsay. (Doc. No. 52 at 6-7). None of the statements at issue from Solomon's declaration are hearsay.

> 1. In late Summer or early Fall of 2017 (approximately the end of August/beginning of September), I came up with the idea for an all-female music festival. The idea came after months of frustration from an industry that did not give opportunities to women in the same way that they do for men. It was, and often still is, common for women to hear such statements as "radio can only play one woman per hour because people don't like to hear women's voices", "we only book one girl per festival because people don't like to watch girls", and "if you're a female artist who is over 25 you may as well move home and die because you're expired"; all statements that, among others, have been said directly to me and to so many other of my talented female colleagues.

(Doc. No. 49-1 ¶ 1). The statements in paragraph one are not hearsay because they are not offered to prove the truth of the matter asserted but rather to show their effects on Solomon, specifically that the statements made her feel frustrated. The Sixth Circuit has explained that "[a] statement that is not offered to prove the truth of the matter asserted but to show its effect on the listener is not hearsay." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 379 (6th Cir. 2009). "Such a statement may be admitted to show why the listener acted as she did." *United States v. Churn*, 800 F.3d 768, 776 (6th Cir. 2015).

> 10. After announcing Zenitheve to the press we began discussions with CMA, CMT and iHeart Radio. Those discussions were very well received. These organizations supported the tour but more importantly the underlying cause and mission of the tour. The iHeart Radio Network is the largest radio broadcaster in the United States.

(Doc. No. 49-1 ¶ 10). Paragraph ten does not contain hearsay because it does not contain any out of court statements.

> 16. On that call I told Michael and Carrie that I had spoken to several female artists I had toured with before and got initial interest from them, that we had raised a small amount of money thus far and were looking for strategic partners, we had interest from CMA and iHeart, we were working on the filming of a documentary series, and we had our application in for Jay Pritzker Pavilion with a hold on May 18, 2019. All of these statements were factually correct.

(Doc. No. 49-1 ¶ 16). Paragraph sixteen contains out of court statements made by Solomon during one of her phone conversations with Live Nation, which she has recordings of and also will be able to testify to at trial. (Doc. No. 56 at 3-4).

> 24. After learning that Live Nation would not be a part of Zenitheve we got back to work trying to make up for lost time on the planning of the festival, including but not limited to, searching for other production partners such as Greg Walton, re-engaging potential investors such as Richard Harmon and beginning to reach out to artists with our iHeart Partners. After several calls to different artist's teams through Michael Jordan (iHeart) we realized that the women who were previously available were no longer available due to radius clauses. This left us perplexed as, as stated before, the women were not, at the time, booked in large numbers on any festivals.
>
> * * *
>
> 26. After learning of the Lake Shake lineup we were no longer able to pursue Zenitheve as Live Nation's actions made it impossible to continue; after which all of our partners and investors pulled out.

(Doc. No. 49-1 ¶¶ 24, 26). Paragraphs twenty-four and twenty-six do not contain hearsay because they do not contain any out of court statements.

2. Damages Speculation

Live Nation asserts that the Court should strike and disregard Solomon's statement that "East Hallows has lost…the original investment of $82,201.77, artist fees directly related to Zenitheve of $177,000, merchandise profits of $138,600, and additional artist fees over $1,500,000" because Solomon is not a damages expert and has no qualifications that would allow her to opine on these numbers with any reasonable degree of certainty. (Doc. No. 52 at 8 (quoting

4

Doc. No. 49-1 ¶ 29)). Live Nation cites no authority for the proposition that expert testimony is required to establish lost profits. Rather, the advisory committee notes to the 2000 amendment to Rule 701 of the Federal Rules of Evidence, governing opinion testimony by lay witnesses, provide that "most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an ... expert." Fed. R. Evid. 701 advisory committee's note (2000). Additionally, the Sixth Circuit has approved the admission of lay opinion as to lost profits. *See United States v. Kerley*, 784 F.3d 327, 339 (6th Cir. 2015) (citing *Lativafter Liquidating Trust v. Clear Channel Comm., Inc.*, 345 F. App'x 46, 51 (6th Cir. 2009)). Live Nation's motion to strike will be denied as to Solomon's statement regarding East Hollows' lost profits.

    3. <u>Contradicts Solomon's Deposition Testimony</u>

Federal courts "have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (collecting cases). To address the problem, courts, including the Sixth Circuit, have developed the "sham affidavit doctrine" which "prevents a party from submitting a new affidavit to manufacture a factual dispute by contradicting an earlier testimony." *Webb v. United States*, 789 F.3d 647, 660–61 (6th Cir. 2015). Not every post-deposition affidavit or declaration is prohibited, however. In discussing the sham affidavit doctrine, the Sixth Circuit has instructed that:

> [A] district court deciding the admissibility of a post-deposition affidavit at the summary judgment stage must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony....A directly contradictory affidavit should be

5

> stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction....If, on the other hand, there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit "constitutes an attempt to create a sham fact issue."

*Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006) (internal citations omitted). Here, Live Nation has not identified any statements in Solomon's declaration that directly contradict her prior sworn testimony. Accordingly, its motion to strike on this basis will be denied.

## C. Exhibit 41

Live Nation argues that Exhibit 41 to the Solomon Deposition should be stricken under Rule 56 because it is an incomplete excerpt of a transcript of a recorded phone conversation that is inadmissible under the Best Evidence Rule. (Doc. No. 51 at 2; Doc. No. 52 at 11) ("The best evidence of a recorded phone conversation is an original of that recording, not a transcript of the original.").

Federal Rule of Civil Procedure 56(c)(2) provides that a party may, in connection with a motion for summary judgment, object "that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "When such an objection is made, '[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.'" *Best Choice Roofing & Home Improvement, Inc. v. Best Choice Roofing Savannah, LLC*, 446 F. Supp. 3d 258, 270–71 (M.D. Tenn. 2020) (quoting Fed. R. Civ. P. 56(c)(2) advisory committee's note). "Although summary judgment should be based on admissible evidence, the evidence does not necessarily have to be presented in final, admissible form at the motion for summary judgment stage." *Id*. at n.6 (citing *Thomas v. Haslam*, 303 F. Supp. 3d 585, 623-25 (M.D. Tenn. 2018)).

East Hallows states that the actual recordings from which the excerpted transcripts were drawn exist and were produced to Live Nation in discovery. (Doc. No. 56 at 2). Additionally, it asserts that Solomon can identify and authenticate the recordings at trial because she was a party to the phone calls. (*Id*.). Live Nation filed a reply, but did not respond to East Hallows' assertions that the original recordings exist, are in its possession, or that Solomon can authenticate them at trial. (*See* Doc. No. 67). The Court finds that East Hallows has met its burden to explain that the admissible form of the recordings is anticipated. Accordingly, Live Nation's motion to strike will be denied as to Exhibit 41.

## II. MOTION FOR SUMMARY JUDGMENT

### A. Factual and Procedural Background

In 2017, Solomon came up with the idea for an all-female music festival, Zenitheve. (Doc. No. 54 ¶¶ 1, 2; Doc. No. 48 ¶ 3). She says the idea came to her "after months of frustration from an industry that did not give opportunities to women in the same way that they do for men." (Solomon Decl. ¶ 1). Solomon approached Jacob Green ("Green"), with the idea for Zenitheve and they agreed to put together the business plan and plan of action for the festival. (Doc. No. 54 ¶ 4).

In February 2018, Solomon and Green hired a law firm to start an LLC and used money from investors to "get everything off the ground." (*Id*. ¶ 6). Solomon and Green were beginning discussions with Balance Pictures in Los Angeles for the filming of a documentary which was to be a behind the scenes look at the festival and an exposé of the state of the country music industry as a whole as it pertains to the mistreatment of and discrimination against women. (*Id*. ¶ 7). They continued to plan the festival by contacting friends and country music artists, meeting with potential investors, taking initial meetings with William Morris Endeavor ("WME"), and meeting with some of the artists' management teams. (*Id*. ¶ 8).

7

In March 2018, after officially establishing East Hallows Limited Liability Company, Solomon and Green engaged a public relations firm and publicly announced Zenitheve. (*Id*., ¶¶ 9, 10).

In May 2018, Live Nation announced that it was starting the Women Nation Fund ("WNF"). (Doc. No. 48 ¶ 18). The WNF advertises itself as a "global, early-stage fund investing in female-founded live music businesses 'in order to' provide access to capital for underrepresented female entrepreneurs in the Concert Promotions, Events and Festival space." (*Id*.; Doc. No. 54 ¶ 15). Solomon stated that "WNF seemed like the perfect fit for what we were trying to accomplish and Zenitheve seemed like the perfect fit for the WNF mission, so we applied." (Solomon Decl. ¶ 12).

After applying for WNF, Solomon and Green continued working on Zenitheve. On May 18, 2019, they filled out an application and put a hold on Jay Pritzker Pavillion in Chicago for May 19, 2019, what they planned as the official launch of the tour. (Solomon Decl. ¶ 14; Doc. No. 43-31 ¶15). However, they never signed a contract or put down a deposit. (Doc. No. 43-31 ¶15).

Live Nation denied Plaintiff's WNF application in June 2018, but then, approximately a month later, scheduled a call to discuss it. (Doc. No. 48 ¶ 23; Doc. No. 54 ¶ 17). The call took place in late July 20, 2018, between Solomon, Carrie Davis, and Michael Wichser. (Doc. No. 54 ¶¶ 18-20). At the time Carrie Davis was Live Nation's Chief Communications Officer, and Michael Wichser was its Senior Vice President, Merger and Acquisitions, who performed due diligence on deals and investments. (*Id*., Doc. No. 48 ¶ 24).

During the call Wichser made the following statements:

- I think this is right down the fairway for the kind of stuff we're interested in.

8

- This sounds like it's pretty timely to me and I can tell you right now I mean we are certainly going to have interest in participating to a large extent
- I need to sort of figure out how to structure something that will work for you and help you get it above the ground
- This is exactly what the fund is set up for

(Doc. No. 54 ¶ 22 (citing Solomon Dep. Ex. 41)).

Based on this phone call, Solomon believed there was a "strong interest" from Live Nation, so they "continued to work on planning and furtherance of Zenitheve, but with a sizeable shift in focus to closing a deal with Live Nation." (Solomon Decl., Doc. No. 49-1 at ¶ 19). She states that Live Nation "led us to believe they would be strong participating partner and considering their size, resources and influence we stopped seeking other investors so as to save enough equity to be able to ensure a deal with Live Nation." (*Id*. at ¶ 20). They also refrained from making offers to artists because a partnership with Live Nation would involve artist acquisitions at a "Live Nation negotiated rate." (*Id*. at ¶ 21).

On August 1, 2018, Solomon sent a follow-up email:

> I'm reaching out to touch base on our call from last week. I love your enthusiasm and am looking forward to talking with you about this more. I wanted to check and see how everything is coming, to schedule a follow up and see if there is anything I can provide to help move things along.

(Doc. No. 50-4 at PageID# 848).

Wichser responded the following day:

> As far as next steps, I think it would make sense to schedule some time for us to review your business plan in some more detail – in other words, we love the mission and vision, but now need to get some specifics. I have some specific questions below but honestly it would be great if you should share whatever you have in terms of a business plan and any key support for it. Some specific questions I have at this point:

9

- Please send a summary business plan with financial estimates for what an investment/partnership with Live Nation would look like:

- What are the key assumptions (ticketing, # days, acts, stages, pricing, sponsorship, artist fees, etc.) for Year 1 of the festival and where are you in procuring the above?

- Do you have an operating and financing model you can share?

- What makes you convinced that artists X, Y, Z will be large enough to draw attendance? Do you need "A" headliner? If so, who would that be?

- There have been a number of different attempts to create Lilith 2.0 ... why is this different and why will it work? What have you been able to learn from those who tried before?

- We also need to develop a more complete understanding of what we would be investing in – we almost exclusively discussed the vision for the festival, but if it were just a festival, we could do a co-pro deal of course and you would keep all your equity! So can you outline for us what the vision for the underlying business is and why an equity deal makes sense?

- How do you plan to staff your organization?

Please let us know if you are able to put the above together and then once ready, let's aim to set up a follow-up discussion to work through.

Look forward to working together,

Michael

(*Id*. at PageID# 847).

On August 9, 2018, Solomon emailed Live Nation information about where she would be holding the first festival, who she was considering for acts, and attached a copy of her business plan. (Doc. No. 48 ¶ 41; Doc. No. 54 ¶ 26). Wichser later said he did not find the business plan particularly helpful. (Doc. No. 54 at ¶ 29 (citing Wichser Dep., 67-68)). He was concerned that there was "no team" in place, that the amount of money requested had increased to a few million dollars, and there was no reference to progress on obtaining artists. (*Id*. at ¶ 30 (citing Wichser Dep., 68-70)). Wichser thought her projected revenues were too high, but he also admitted he did

not understand the financing section of the plan and never asked Solomon about it. (*Id*. at ¶¶ 32-33).

On September 6, 2018, Wichser, Davis, and Solomon had a second phone call. Plaintiff provided a partial transcript of the call. (Doc. No. 49-5 at PageID# 794-95). During the call, Wichser stated, among other things, that:

- We were super excited by our first meeting as you heard probably in our enthusiasm and obviously want to keep the conversation going.

- Probably what would make sense is if you could shoot us an email that outlines some of the basic tenants of your timeline and the festival. That would help us forward something along, put a little more structure around. We'll review the timeline, potential artists are x, y and z and we can sort of circle around, and then we can be comfortable investing in all this stuff and try to get that to you in short order.

- We did preview it with Michael our CEO and did have a preliminary conversation with him already and we did that weeks ago.

- [C]learly what you're trying to accomplish is right down the pipeline of what a fund like this would want to do. I think there's no doubt about it.

- If we wanted to put three million dollars towards the next Lilith Fair we'd probably do it, we wouldn't hire you to do it for us but we would probably just do it.

(*Id*.).

The conversation ended with the following exchange:

Solomon: So, what do you see as the biggest obstacles or our next step to moving this forward?

Wichser: Send me that email. That will give us some actual, I just need something I guess I would say something sort of in writing to help pencil this out and frame it. Because again, we have to preview this conversation with Michael, and it would be good to have something in writing to formally go and say here's a proposal we want to support, here's the structure we'd recommend, and here are the ligaments.

11

> Solomon: Okay. And you're looking for timeline of the festival and the artists we want? I just want to make sure I'm understanding exactly what you're hoping out of the email.
>
> Wichser: Yes, frame it out for us in a little more detail what it looks like.
>
> Solomon: Okay.

(*Id.*).

On October 10, 2018, Carrie Davis sent Solomon and email stating that "after discussing internally and understanding Live Nation's history in trying to bring similar events to life," Live Nation had decided to "pass" on being involved in Zenitheve "this year." (Doc. No. 43-20). She added, "We would very much like to see where the event takes you this year." (*Id.*). In a subsequent phone call, Wichser encouraged Solomon to continue to plan the festival, saying that should she prove that East Hallows had an algorithm that would work, she should get back in touch with Live Nation to re-evaluate an investment. (Doc. No. 48 at ¶ 54). When later asked to provide its reasons for deciding not to support Zenitheve, Live Nation stated:

> [A]mong other things, Plaintiff's proposal was to promote a festival and that it was not an ongoing business, which was the criteria Live Nation sought as part of the Women Nation Fund and that an all-female country festival was not a viable business opportunity based upon its prior experience promoting similar festivals, which were not financially successful. Live Nation also did not consider Plaintiff's proposal to be compelling or unique.

(Def. Interrog., Doc. No. 48-5 at ¶ 9).

A month after Live Nation declined to invest in Zenitheve, it announced that the first day of Live Nations' annual Lake Shake Festival in Chicago would have an all-female lineup. The Lake Shake Festival was organized each year by Brian O'Connell, President of Country Touring for Live Nation. (Doc. No. 48 at ¶¶ 55, 57). O'Connell stated that he decided to make it an all-female lineup after learning that Miranda Lambert and Maren Morris both were available on the first day of the festival. (*Id.* at ¶¶ 60-61). The lineup included artists that Plaintiff suggested as

12

artists for Zenitheve. (Doc. No. 54 at ¶ 36). O'Connell states that, at the time he decided to organize an all-female lineup for the first day, he had never heard of Zenitheve or East Hallows' plans or lineup. (O'Connell Decl. at ¶ 6).

Solomon stated that East Hallows was unable to continue pursuing Zenitheve. (Doc. No. 54 at ¶ 37). On May 7, 2019, East Hallows filed a Complaint in the Circuit Court for Davidson County, Tennessee against Live Nation, alleging intentional or negligent misrepresentation. (Doc. No. 1-1). Live Nation removed East Hallows' action to this Court on May 31, 2019. (Doc. No. 1). Live Nation filed the pending motion for summary judgment on January 22, 2021. (Doc. No. 43).

**B. Standard of Review**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Id.*

In evaluating a motion for summary judgment, the court views the facts in the light most favorable for the nonmoving party, and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been

13

presented to make the issue of material fact a proper jury question. *Id.* The mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence of which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

## C. Intentional and Negligent Misrepresentation

Tennessee courts consider "fraud," "intentional misrepresentation," and "fraudulent misrepresentation" to be different names for the same cause of action. *Hodge v. Craig*, 382 S.W.3d 325, 342 (Tenn. 2012). To recover for intentional misrepresentation, a plaintiff must prove: (1) the defendant made an intentional misrepresentation of a material fact; (2) the defendant made the representation "knowingly" without belief in its truth, or "recklessly," without regard to whether it was true or false; (3) the plaintiff justifiably relied on the misrepresentation and suffered damages; and (4) the misrepresentation relates to an existing or past fact. *Id*. at 343; *Power & Telephone Supply Co., Inc. v. SunTrust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006).

As to the final element, Tennessee recognizes fraudulent misrepresentation claims based on "promissory fraud," which requires the plaintiff to show the misrepresentation "embod[ied] a promise of future action without the present intention to carry out the promise." *Power & Telephone Supply*, 447 F.3d at 931 (quoting *Stacks v. Saunders*, 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990)). In other words, a future promise can support a claim for intentional misrepresentation if it was made with the intent not to perform. *City of Morristown v. AT&T Corp.*, 206 F. Supp. 3d 1321, 1332 (E.D. Tenn. 2016) (citing *Fowler v. Happy Goodman Family*, 575 S.W.2d 496, 499 (Tenn. 1978)). Promissory fraud requires more than "a subsequent failure to keep the promise." *Alsbrook v. Concorde Career Colleges, Inc*., 469 F. Supp. 3d 805, 845 (W.D. Tenn. 2020). The promisor's intention must be "shown to be false when made (*i.e.*, a misrepresentation of actual

14

Case 3:19-cv-00465   Document 84   Filed 08/10/22   Page 14 of 18 PageID #: 1313

present intention) by evidence other than subsequent failure to keep the promise or subjective surmise or impression of the promisee." *Fitzgerald v. Hickman Cty. Gov't*, 2018 WL 1634111, at *18 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Farmers & Merch. Bank v. Petty*, 664 S.W.2d 77, 80-81 (Tenn. Ct. App. 1983)); *American Cable Corp. v. ACI Mgmt., Inc.,* 2000 WL 1291265, at *5 (Tenn. Ct. App. Sept. 14, 2000) (internal citations omitted) ("In the context of a promissory fraud claim, the mere fact that the promisor failed to perform the promised act is insufficient by itself to prove fraudulent intent. The reason is that ordinarily, where nothing else is shown, mere failure to perform a promise can be as consistent with an honest intent as with a dishonest one. Not every broken promise starts with a lie.").

Negligent misrepresentation claims are limited to "business or professional persons who negligently supply false information for the guidance of others in their business transactions." *Hodge*, 382 S.W.3d at 345. To recover for negligent misrepresentation, the plaintiff must prove (1) the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; (2) the defendant supplies faulty information meant to guide others in their business transactions; (3) the defendant fails to exercise reasonable care in obtaining or communicating the information; and (4) the plaintiff justifiably relies upon the information. *Robinson v. Omer*, 952 S.W.2d 423, 427 (Tenn. 1997); *see also Thompson v. Bank of Am.*, 773 F.3d 741, 752 (6th Cir. 2014). The misrepresentation must consist of a statement of a material past or present fact.[2] *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982).

---

[2] Negligent misrepresentation does not encompass misrepresentation involving future events. *See D'Alessandro v. Lake Developers, II, LLC*, 2012 WL 1900543, at *7 (Tenn. Ct. App. May 25, 2012) (affirming dismissal of negligent misrepresentation claims concerning future events).

15

For either claim, "[s]tatements of future intention, opinion, or sales talk are generally not actionable because they do not involve representations of material past or present fact." *Power & Telephone Supply*, 447 F.3d at 931 (fraudulent misrepresentation); *McElroy*, 632 S.W.2d at 130 (statements of opinion or intention or puffing or sales talk are generally not actionable as a claim for negligent misrepresentation).

Plaintiff identified the following statements as misrepresentations by Live Nation. Wichser's statements during the initial call on July 20, 2018:

- I think this is right down the fairway for the kind of stuff we're interested in.

- I need to sort of figure out how to structure something that will work for you and help you get it above the ground.

- This is exactly what the fund is set up for.

(Doc. No. 47 at 11).

Wichser's statements during the second call on September 6, 2018:

- We were super excited by our first meeting as you heard probably in our enthusiasm and obviously want to keep the conversation going.

- We did preview it with Michael our CEO and did have a preliminary conversation with him already and we did that weeks ago.

- We'll review the timeline, potential artists are x, y and z and we can sort of circle around, and then we can be comfortable investing in all this stuff and try to get that to you in short order.

- [C]learly what you're trying to accomplish is right down the pipeline of what a fund like this would want to do. I think there is no doubt about it.

(*Id*. at 11-12).

Several of these statements are nonactionable statements of opinion, future intention, or sales talk made in the context of discussing Live Nation's possible investment in Zenitheve. The nonactionable statements include: "I think this is right down the fairway for the kind of stuff we're interested in" (opinion and sales talk); "I need to sort of figure out how to structure something that

16

will work for you and help you get it above the ground" (future intention and sales talk); and "We were super excited by our first meeting as you heard probably in our enthusiasm and obviously want to keep the conversation going" (sales talk). Similarly, Wichser's statements that he was "interested," "excited," and "enthusiastic" are mere sales talk, not representations of fact.

Plaintiff also cites two statements about the purpose of the fund as misrepresentations. She does not, however, claim that either of these statements were false. Accordingly, statements that Zenitheve was "what the fund is set up for" or "right down the pipeline of what a fund like this would do" cannot form the basis for her misrepresentation claim. Plaintiff also does contend that Wichser did not, in fact, "preview" the Zenitheve concept with Live Nation's CEO. Without a claim of falsity, Plaintiff's misrepresentation claim based on these statements fails.

Finally, Plaintiff suggests that Wichser's statement, that he would "review the timeline, potential artists are x, y, and z and we can sort of circle around, and then we can be comfortable investing in all of this stuff and try to get that to you in short order" meant that he was promising that "once he'd reviewed the timeline and potential lineup he would get an investment to her in short order." (*Id*. at 16). Plaintiff contends the statement was false, because Wichser, in fact, had concerns about various aspects of Plaintiff's business plan and financial projections. (*Id*. at 14). Plaintiff argues that Wichser must have "chos[en] to mislead Ms. Solomon on September 6 promising to get her a Live Nation investment in short order, or he is now telling a falsehood about his concerns in an effort to cover his tracks." (Doc. No. 47 at 14).

The statement itself, however, makes clear, that Wichser was not yet "comfortable investing" in Zenitheve. Plaintiff does not contend that Wichser never intended to "review the timeline and potential artists" and "circle around." If Plaintiff viewed the statement as a guarantee

17

that Live Nation would be "comfortable investing" no matter the content of the information she was to provide, this is not a reasonable interpretation.

To the extent Plaintiff argues that Wichser's communications as a whole misrepresented Live Nation's intent to invest in and support Zenitheve, this too fails. To establish a claim based on a promise of future action, Plaintiff must show that Live Nation made a promise of future action – here the promise of future investment in Zenitheve – without the present intent to carry out the promise. *Power & Telephone Supply*, 447 F.3d at 931. Here the claims fails as to the first aspect of this element – a promise of future action. Even viewing the communications as a whole, it is clear that Wichser never promised that, no matter what the due diligence revealed, Live Nation would invest in Zenitheve at the conclusion of the due diligence process.

Because Plaintiff has not identified a misrepresentation of a material existing or past fact or a false promise of future action, the claims for intentional misrepresentation and negligent misrepresentation fail. The Court need not consider the remaining elements of the claims.

## III. CONCLUSION

For the reasons stated, Defendant's Motion to Strike (Doc. No. 51) is **DENIED** as to the Declaration of Rae Solomon and Exhibit 41, and **MOOT** as to the expert reports. Defendant's Motion for Summary Judgment (Doc. No. 43) is **GRANTED**.

An appropriate order will enter.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE